IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 3, 2008

**STATE OF TENNESSEE v. AQUELLIS QUINTEZ TUCKER**
**Appeal from the Circuit Court for Hardeman County**
**No. 06-01-0192    J. Weber McCraw, Judge**

---

**No. W2007-02361-CCA-R3-CD  -  Filed October 21, 2008**

---

A Hardeman County jury convicted the defendant, Aquellis Quintez Tucker, of one count of first degree felony murder, one count of first degree premeditated murder, one count of attempted first degree murder, one count of aggravated assault, and one count of especially aggravated burglary. The trial court merged the two first degree murder convictions, and it also merged the defendant's attempted first degree murder and aggravated assault convictions.  The trial court sentenced the defendant to life in prison on the first degree murder conviction, fifteen years on the attempted first degree murder conviction, and eight years on the especially aggravated burglary conviction, with all sentences to be served concurrently.  The defendant appeals, asserting that the evidence produced at trial was insufficient to support his convictions.  After reviewing the record, we conclude that no error exists with respect to the defendant's allegations.  However, we further conclude that the defendant's especially aggravated burglary conviction was precluded by statute.  Accordingly, we modify that conviction to one for aggravated burglary and remand the case to the trial court for sentencing on that offense.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed as Modified; Case Remanded for Resentencing.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Matthew R. Armour, Somerville, Tennessee, for the appellant, Aquellis Quintez Tucker.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany, Assistant Attorney General; D. Michael Dunavant, District Attorney General; Joe L. VanDyke, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At trial, Lewis Fuller testified that on March 30, 2005, he resided in an apartment located on Hatchie Haven Drive in Bolivar.  Fuller said that the apartment belonged to a friend, Corey Edwards. That afternoon, Fuller and the defendant, whom Fuller said he had known for five or six years, were conversing at Edwards' apartment.  At one point during the conversation, the defendant said that he

was tired of people "messing with him," "bothering him," and "using him." The defendant also told Fuller that if he "didn't have his $10.00 by Thursday or Friday[1] . . . we were going to throw down." Fuller testified that he owed the defendant $10 from "a deal that happened earlier [in] the month." Fuller said that he felt threatened, so he asked the defendant if he was threatening him. The defendant did not reply and instead left the apartment.

Fuller testified that the defendant's behavior was troubling because Fuller knew the defendant to be a good-natured person. Accordingly, Fuller followed the defendant outside and again asked him what was wrong. The defendant again said that he was tired of people messing with him, then he hit Fuller on the side of his head. Fuller again asked the defendant what was wrong; after the defendant hit Fuller a second time, the two men began to fight. During the altercation, Fuller pinned the defendant on the ground. In an attempt to escape, the defendant bit Fuller's finger, which led Fuller to hit the defendant in an attempt to free his finger from the defendant's mouth. Ultimately, the two men stopped fighting and the defendant left the apartment complex.

After the fight, Fuller returned to the apartment, where Edwards was also present. Fuller testified that he and Edwards "dozed off," but after a while he awoke when he heard a knock on the door. Fuller said that he and Edwards ignored the knock, but he then heard a "real strong beat at the door" and saw the door "come flying open." Fuller said that he did not see anybody enter the apartment once the door opened, so he got up to investigate. At that point, he saw the defendant enter the apartment. Fuller said that the defendant shot him in the right shoulder. This caused Edwards to "jump[] up off the couch;" Fuller surmised that this action "stunned" the defendant, who then shot Edwards. After the defendant shot Edwards, Fuller, who had been lying on the floor "play[ing] like [he] was dead," saw a pocket knife on the kitchen counter. Fuller attempted to get the knife and throw it at the defendant, but the defendant shot Fuller again. Fuller then saw the defendant "fumbling with something in his hand." At that point, Fuller "ran at and charged" the defendant, but the defendant shot Fuller in the head before he reached the defendant. Fuller said that he was shot four times: twice in the shoulder, once in the arm, and once in the head.

Fuller testified that after the shooting, he knocked on the door to the apartment next door to his. Nobody answered, so he went to another apartment. Nobody answered there, so he went across the street to Dewey Harris' residence. Harris called 911, and the police and an ambulance soon arrived. Fuller said that he spoke to police the night of the shooting and that he also talked to police at the hospital a few days after the shooting. Both times, he identified the defendant as the shooter.

Fuller admitted that he routinely used drugs with the defendant at the time of the shooting. He said that on the day of the shooting, he had not used drugs in two days, but this lack of using resulted from not having any drugs in his apartment. Fuller further admitted that he had a prior forgery conviction for which he was incarcerated for thirteen months, and that he had previously been charged with a drug-related offense.

---

[1]March 30, 2005, was a Wednesday.

On cross-examination, Fuller said that the shooting occurred around 8:00 that evening. Fuller said it was dark in Edwards' apartment and that only the TV light was on in the apartment. Fuller said that he was farsighted, wore glasses, and did not see well at night, yet he was still able to see the defendant's face. Fuller said that a light from outside the apartment shining through the open door allowed him to see the defendant, although he admitted that he did not know what the defendant was wearing and did not see a gun in the defendant's hand. Fuller admitted that he did not open the door when he heard the first knock because numerous people frequented the apartment, with some of the visitors doing drugs there. Fuller admitted that he had previously told police that the $10 he owed the defendant was from a drug deal that had occurred six or seven months before the shooting; when asked why he had testified at trial that the transaction had occurred the same month as the shooting, Fuller replied, "I don't know what you mean about that."

Fuller said that although he told police that the shooter was named Aquellis, he was unable to provide police with the shooter's last name. Fuller said that when a policeman asked if the shooter's name was Aquellis Tucker, Fuller said that it was. Fuller also admitted that he told police that he had known the defendant two or three years.

On redirect, Fuller testified that Edwards was in poor health. Fuller noted that Edwards "went to the kidney machine [be]cause his . . . kidney was bad" and was also "on a breathing machine" and "took a lot of medication." Fuller also said that Edwards had a "loose bone in his right hip" that caused Edwards to walk with a limp. Fuller testified that he had told police that he had known the defendant for two or three years, but two years had elapsed between the incident and the trial date, thus accounting for his testimony that he knew the defendant five or six years.

On recross, Fuller said that he had earlier told defense counsel that he did not want to see the defendant get hurt and that he could not say with absolute certainty that the defendant was the shooter. However, on further redirect, Fuller said that the last thing he had told defense counsel at that earlier meeting was that the defendant was the shooter.

Captain Steven Stanley with the Whiteville Police Department testified that in March 2005, he responded to this shooting while employed with the Bolivar Police Department. Captain Stanley said that at around 8:00 that evening, he received a call notifying him of the shooting. He then proceeded to Dewey Harris' apartment, where he observed Fuller walking toward him outside the apartment. Captain Stanley ordered Fuller onto the ground. Fuller complied and then told Captain Stanley that he had been shot across the street at 619 Hatchie Haven. Fuller also said that the shooter, whom Fuller initially did not identify, was still in the house. Captain Stanley then went to Edwards' apartment, where he observed Edwards lying on the floor. Captain Stanley, a certified emergency medical technician (EMT), noted that Edwards "was in respiratory distress, having a whole lot of trouble breathing at that point." Captain Stanley did not assist Edwards at that point because he believed that the shooter was still in the apartment. Captain Stanley did not find the shooter in the apartment, so he returned to Fuller, who was still outside Harris' apartment. Captain Stanley testified that he believed Edwards was dead when he left the apartment.

Upon returning to Harris' apartment, Captain Stanley asked Fuller to recount the shooting. The substance of Fuller's on-the-scene statement to Captain Stanley was the same as his trial testimony. When Captain Stanley asked Fuller who had shot him, Fuller replied that "Aquellis shot me." Fuller said that the shooting occurred over $10. Fuller, who at that point was bleeding "profusely," also said, "I don't want to die."

After Captain Stanley finished talking to Fuller, he, along with Captain Baker and Chief Anthony, began examining the crime scene for physical evidence. Captain Stanley found two live .25 caliber rounds near the area where Fuller had observed the defendant "playing with his hands." He also recovered four spent .25 caliber shell casings the night of the shooting and one additional shell casing the morning after the shooting. Captain Stanley observed that the door frame had been broken, and he also saw a blood trail leading from the apartment to the doors of other apartments near Edwards' apartment. Captain Stanley said that he did not find blood on Harris' porch because Harris "had taken hot bleach water and washed [the blood] off of the porch because he said he didn't want him bleeding on his porch." Captain Stanley said that the evidence found at and near the apartment was consistent with the version of events Fuller had provided the night of the shooting.

On cross-examination, Captain Stanley said that he and his two colleagues did not find any physical evidence that would have placed the defendant at the scene. He also admitted that the police did not find a gun in the defendant's car or at his residence and that no gun was registered in the defendant's name. He said that the police were unable to find a footprint on the doorframe, and he said that the police did not take any fingerprints from the door handle. Captain Stanley identified several reasons for the failure to dust the doorknob for fingerprints. First, no prints were taken because the defendant had already been identified as a suspect. Furthermore, the police knew that the defendant had been to the apartment before the day of the shooting and therefore they would be unable to determine "if [the prints were] from a previous occasion or from this occasion." Captain Stanley also said that he knew that several people visited the apartment and therefore he was "not sure what all you could have pulled from there. When we visually looked, we did not see a legible print." He also noted that the police did not test blood that was found on a knife at the crime scene.

Captain Stanley said that the defendant turned himself in to police "one to two days" after the shooting. He said that he was unaware of any of Fuller's neighbors saying that they had seen the defendant near Edwards' apartment the night of the shooting.

On redirect, Captain Stanley said that he spoke with Dewey Harris after the shooting. Captain Stanley said that Harris had spoken to the defendant, and Harris' statement to police corroborated Fuller's statement that the defendant had been present at the apartment with a gun. Captain Stanley said that when the defendant turned himself in to police, the defendant appeared to have "a fairly long scratch" on the side of his face. On recross, Captain Stanley said that his search of the apartment revealed several prescription medicines that were prescribed to Edwards.

Investigator Pat Baker with the Bolivar Police Department testified that he responded to the shooting. Upon arriving at the scene, he saw Fuller lying on the ground outside Harris' apartment.

Fuller was bleeding "pretty badly" from a head wound, a shoulder wound, and an arm wound. Investigator Baker noted that Fuller said several times that he did not want to die, and he thought that Fuller was not going to survive the shooting. Investigator Baker asked Fuller to recount the shooting, and Fuller did so, with the substance of his statement mirroring that of his trial testimony. Captain Stanley then approached Fuller and asked him what had happened. At that point, Fuller "repeated the same story that he had told me just minutes earlier." Investigator Baker said that Fuller identified the shooter as "Aquellis," but he did not remember whether Fuller said that the shooter's last name was Tucker.

Investigator Baker said that on April 1, Fuller gave a statement in a Jackson hospital while recovering from his injuries. According to Investigator Baker, the statement was "identical" to the one Fuller had given at the crime scene. The officer said that he also interviewed the defendant after he turned himself in to police. The defendant told Investigator Baker that he arrived at Fuller's apartment after Fuller and Edwards called him to come over. According to the defendant, he and Fuller got into a physical altercation, during which Edwards "jumped in." The defendant said that at one point, Fuller pulled a gun, which the defendant was able to grab and point at Fuller. Then, according to the defendant, "the gun started going off." Investigator Baker said that this statement was inconsistent with both the evidence found at the crime scene and a statement he took a statement from Harris, which the officer said Harris made after speaking with the defendant.

Investigator Baker said that the Tennessee Bureau of Investigation (TBI) crime lab examined the shell casings taken from the apartment and concluded they were fired from the same weapon. He also said that after Harris informed police that he had received a telephone call from the defendant, the police searched Harris' phone records and traced a particular phone number to a cellular phone that the defendant had been using.

On cross-examination, Investigator Baker said that the police did not attempt to take fingerprints from the crime scene because the police knew that the defendant had been at the apartment before the shooting and, therefore, they knew that they were likely to find his prints there. He also said that the police did not search the shell casings or live ammunition for fingerprints because the surfaces of the bullets were too small to leave a fingerprint which could be matched with any degree of certainty. He also said that the police did not check the knife found in the apartment for blood. Investigator Baker also admitted that the cellular phone which the defendant supposedly used to call Harris was not registered in the defendant's name, and he also noted that the police did not find the phone in the defendant's possession or in his vehicle or residence.

Dewey Harris testified that on March 30, 2005, he lived in an apartment on Hatchie Haven Drive. That night, Fuller came to Harris' door and requested help. Harris called 911 for Fuller, who was bleeding profusely at the time. Harris testified that he spoke to the defendant via telephone after the shooting, although Harris gave differing dates on which he received the call. At trial, Harris said that he spoke to the defendant while the police were looking for him, some four or five days after the shooting. However, in a statement he gave to Captain Stanley on March 31, 2005, the day after the shooting, Harris said that the defendant called him at 2:30 the morning after the shooting. Harris

testified that the defendant told him that "he went in after [Fuller] . . . . He wasn't trying to kill [Edwards] . . . ." Harris admitted that in his statement to Captain Stanley, he had specifically said that the defendant told him "Man, I hate I killed those two guys. . . . [Edwards] just got in the way."

On cross-examination, Harris said the defendant called him three or four days after the shooting, and that by this point, he had heard about the shooting from another person. He said that he had no idea how Fuller got shot, nor did he care about the circumstances surrounding the shooting. On redirect, Harris said that Fuller was not a friend of his, and he also noted that he would not have lied to the police to help Fuller.

Joshua Chapman, an inmate at the Hardeman County Jail, testified that in July and August 2005, he was locked up "on the same side of the jail as [the defendant]." He said that one day the defendant "bragg[ed] about how he got robbed and he went back home and got a gun and c[a]me back and killed one guy and shot another one." Chapman said he had never met the defendant before this conversation and he had never heard about this case. Chapman testified that the defendant told him that the defendant said that the gun "had been put in a vi[s]e," meaning that the gun had been cut up after the shooting. Chapman testified that he told the police about this discussion after it occurred.

On cross-examination, Chapman said that the defendant related the details of the shooting while they were together in a jail cell. Chapman said that other prisoners were in the cell that day, but to the best of his knowledge, none of the other prisoners made a statement to the police regarding the defendant's statements. Chapman admitted that after bonding out of jail in 2005, he was arrested in Mississippi, which led to his missing a court date in Hardeman County and being placed in jail again. He was released from jail in late 2005 and put on probation, but after a theft charge in Shelby County, he was returned to the Hardeman County Jail and charged with violating his probation. Chapman said that he also had prior burglary charges and had used illegal drugs in the past.

Willie Lamont Harris testified that he saw the defendant the night of the shooting. Harris testified that he saw a scar on the defendant's face and that he heard from other people who were present that evening that the defendant got into a fight with Fuller. Harris said that the defendant said nothing about the argument, and Harris denied seeing the defendant leave the location where he, the defendant, and the other persons had gathered.

Dr. Kenneth Snell testified that he performed Corey Edwards' autopsy. Dr. Snell testified that at the time of his death, Edwards exhibited symptoms of hypertensive heart disease, more commonly known as hypertension, and that he suffered from end state renal disease. Dr. Snell observed that Edwards "had evidence of surgical grafts in his arms that would be used for dialysis." Dr. Snell also testified that Edwards died of a single gunshot wound to the chest. Following Dr. Snell's testimony, the state offered a stipulation whereby TBI Special Agent Steve Scott, a forensic scientist who examined the bullet fragments recovered from the victims as well as the shell casings recovered from Edwards' apartment, would have testified that the shell casings were fired from the same firearm and that the bullet fragments pulled from Edwards and fuller bore "the same class

characteristics and similar individual characteristics with each other; however, the similarities are insufficient for conclusive identification of [the two bullets] together."

The defendant did not testify or present witnesses on his behalf. After receiving the evidence, the jury convicted the defendant of the charged offenses. The trial court merged the defendant's two first degree murder convictions as well as his convictions for attempted first degree murder and aggravated assault. This appeal followed.

ANALYSIS

The defendant's sole issue on appeal is that the evidence produced at trial was insufficient to sustain his convictions. An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

*Identity of Defendant as Perpetrator*

Before addressing whether the evidence was sufficient to establish the elements of the offenses for which the defendant was convicted, we address the defendant's assertion that the evidence was insufficient to establish that the defendant actually committed the offenses. In support of his argument, the defendant emphasizes that there was no physical evidence placing the defendant at the crime scene and that the only witness who identified the defendant as the perpetrator was Fuller, who the defendant asserts "made inconsistent statements and admitted to having very poor eyesight." However, we find the defendant's arguments unpersuasive.

"[T]he identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). This court has consistently held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)); see also State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App.

1998); State v. McMahan, 614 S.W.2d 83, 85 (Tenn. Crim. App. 1981). In this case, Fuller consistently identified the defendant as the person who broke into the apartment and shot both him and Edwards. Fuller identified the defendant as the perpetrator both at trial and in two statements he gave to police, including one statement he gave to police the night of the shooting. Furthermore, the location of the blood, knife, shell casings, and live rounds found at the scene substantiated Fuller's testimony about the actions of the victims and shooter in the apartment. Therefore, we conclude that the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was the perpetrator of these offenses.

*Sufficiency of Evidence for Indicted Offenses*

The defendant was convicted of first degree premeditated murder and first degree felony murder. A conviction for first degree felony murder, as charged in the indictment, requires proof of a "killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary." Tenn. Code Ann. § 39-13-202(a)(2) (2003). A conviction for first degree premeditated murder requires proof that the defendant committed a "premeditated and intentional killing." Id. § 39-13-202(a)(1). The first degree murder statute explains the term "premeditation" as follows:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (2003). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. Additional factors cited by this court from which a jury may infer premeditation include "planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." State v. Halake, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)).

The defendant was also convicted of aggravated assault and attempted first degree murder against Fuller. As relevant to this case, a person commits assault by "[i]ntentionally or knowingly caus[ing] bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1) (2003). Aggravated assault, as charged in the indictment, is committed by a person who "[i]ntentionally or knowingly commits an assault . . . and . . . [u]ses or displays a deadly weapon." Id. § 39-13-102(a)(1)(B). Tennessee's criminal code states that "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . acts with intent to cause a result that is an element

of the offense, and believes the conduct will cause the result without further conduct on the person's part." Id. § 39-12-101(a)(2).

Finally, the defendant was convicted of especially aggravated burglary. As relevant to this case, burglary is committed by a person "who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony . . . or assault." Id. § 39-14-402(a)(1). The indictment in this case identified "murder" as the relevant felony. Aggravated burglary is burglary of a habitation. Id. § 39-14-403(a). Especially aggravated burglary is defined as "[b]urglary of a habitation or building other than a habitation . . . [w]here the victim suffers serious bodily injury." Id. § 39-14-404(a)(1)-(2).

In this case, the evidence reflects that on the afternoon of March 30, 2005, the defendant informed Fuller that he was tired of people "messing" with him, and that if Fuller did not repay the $10 he owed the defendant, the two men would "throw down." Fuller and the defendant then got into a physical altercation before the defendant left Edwards' apartment. That evening, the defendant broke down Edwards' door, entered the apartment, and shot Fuller four times and Edwards once, killing Edwards and injuring Fuller. This evidence was sufficient to convict the defendant of first degree felony murder. Regarding the defendant's convictions for premeditated first degree murder and attempted first degree murder, the defendant's announcing his intent to cause harm to Fuller if Fuller did not repay the money he owed the defendant, the defendant's leaving Edwards' apartment, and his returning several hours later with a gun was evidence of premeditation. The defendant's breaking down the apartment door and shooting Fuller four times and Edwards once was evidence that the defendant acted intentionally. This evidence was sufficient to convict the defendant of aggravated assault and attempted first degree murder. Although there is no evidence in the record suggesting that the defendant threatened to kill or otherwise harm Edwards, such a finding is not necessary to sustain a conviction for premeditated first degree murder in this case:

> Rather, the [first degree murder] statute simply requires proof that the defendant's objective was to kill a person, i.e., "cause the result." In short, if the evidence demonstrates that the defendant intended to "cause the result," the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is [premeditated] first degree murder."

Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999). As such, we conclude that the evidence was sufficient to convict the defendant of premeditated first degree murder.

The evidence was also sufficient to convict the defendant of the remaining offense. The evidence indicates that the defendant initially threatened Fuller over Fuller's supposed failure to repay a debt he owed the defendant. Several hours after the initial altercation, the defendant broke into Edwards' apartment with the intent to commit murder or assault. While the defendant was in Edwards' apartment, he shot Fuller four times, seriously injuring him. This evidence was sufficient to convict the defendant of especially aggravated burglary. Finding that the evidence was sufficient

to support the defendant's convictions, we deny him relief.

*Modification of Especially Aggravated Burglary Conviction*

Although not addressed by either party, this court notes that the defendant's conviction for especially aggravated burglary in addition to the other offenses is precluded by Tennessee Code Annotated section 39-14-404(d) which states that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." See, e.g., State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993); State v. Oller, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992). The practical import of subsection (d) is such that the defendant could not have been found guilty of especially aggravated burglary, in which serious bodily injury of Fuller was an element of the offense, and of aggravated assault, in which Fuller's serious bodily injury was also an element. Therefore, the defendant's conviction for especially aggravated burglary, a Class B felony, shall be modified to one for aggravated burglary, a Class C felony, and remanded for sentencing.

*Entry of Revised Judgments*

Finally, we note that although at the sentencing hearing the trial court merged the defendant's two first degree murder convictions, as well as his convictions for attempted first degree murder and aggravated assault, the mergers of those offenses for sentencing purposes are not properly reflected on the judgment forms. The judgment forms for the defendant's premeditated first degree murder (Count 2) and aggravated assault (Count 4) guilty verdicts state, "defendant is not convicted nor sentenced in this count." The trial court's notations are correct, as "the trial court's entry of only one judgment of conviction imposing only one sentence . . . protects the defendant from receiving multiple punishments for the same offense." State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). However, the judgment forms must be corrected, pursuant to Rule 36 of the Tennessee Rules of Criminal Procedure, to properly reflect the merger. As to Count 1, the judgment shall reflect a conviction for first degree murder and a life sentence as well as a notation that the verdict of guilt as to Count 2 is merged with the conviction in Count 1. Likewise, the judgment as to Count 3 shall reflect a conviction for attempted first degree murder and a sentence of fifteen years, as well as a notation that the verdict of guilt as to Count 4 is merged with the conviction in Count 3.

CONCLUSION

The evidence produced at trial was sufficient for a jury to find beyond a reasonable doubt that the defendant was guilty of felony murder, attempted first degree murder, and aggravated assault. Accordingly, the judgments of the trial court are affirmed as to those offenses. However, as the defendant's conviction for especially aggravated burglary is precluded by statute, the judgment of conviction for especially aggravated burglary is modified to aggravated burglary. The case is remanded to the trial court for resentencing as to that offense, as well as for the entry of revised judgments that properly reflect the merger of the defendant's first degree murder convictions and the

-10-

merger of his convictions for attempted first degree murder and aggravated assault.

_____
D. KELLY THOMAS, JR., JUDGE